DOWNEY BRAND LLP
SALLIE B. ARMSTRONG (Bar No. 1243)
MICHELLE N. KAZMAR (Bar No. 10098)
427 West Plumb Lane
Reno, NV 85909
Telephone: (775) 329-5900
Facsimile: (775) 786-5443
Email: reno@downeybrand.com
Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEVADA

| In re: | Case No.: BK-N-10-50307-GWZ |
|---|---|
| WESTERN DAIRY SPECIALTIES, LLC, | Chapter 11 |
| Debtor. | (Request for Joint Administration Pending) |
| In re: | Case No.: BK-N-10-50308-GWZ |
| NEVADA RESOURCE DYNAMICS, LLC, | Chapter 11 |
| Debtor. | Date: **OST Requested**<br>Time: |

**MOTION FOR ENTRY OF AN ORDER APPROVING STIPULATION WITH NEVADA STATE BANK FOR (A) USE OF CASH COLLATERAL BY DEBTORS PURSUANT TO 11 U.S.C. § 363(c)(2); (B) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361 & 363(e); (C) AUTHORIZING POST-PETITION FINANCING ON A JUNIOR SECURED BASIS PURSUANT TO 11 U.S.C. § 364(c); and (D) AUTHORIZING THE INTERIM ADVANCE OF UP TO $136,102 PENDING THE FINAL HEARING**

Debtors, Western Dairy Specialties, LLC, a Nevada limited liability company ("Western Dairy"), and Nevada Resource Dynamics, LLC, a Nevada limited liability company ("NRD" and, together with Western Dairy, collectively, the "Debtors"), by and through their counsel, Downey Brand, LLP ("Downey Brand") hereby move this Court for entry of an order approving the proposed post-petition debtor-in-possession financing (the "DIP Loan") on an interim basis from Nevada State Bank ("Lender" or "NSB") in the amount of approximately $136,102 (the "Interim Order"), and setting a final hearing (the "Final Hearing") thereon, as well as approval of the use of cash collateral on the terms and subject to the conditions set forth herein.

This Motion is made and based upon the following points and authorities, the

1079676. 5

This Motion is made and based upon the following points and authorities, the accompanying Declaration of Matthew Berry (the "Berry Declaration") and Declaration of Mike Hanley (the "Hanley Declaration"), the record in this case, including the pleadings and documents filed on behalf of the parties, judicial notice of which is respectfully requested, the arguments and representations of counsel, and any oral or documentary evidence presented at or prior to the time of the hearing.[1]

# I.
## CONCISE STATEMENT OF RELIEF REQUESTED

A.  **General Provisions.**

This concise statement of relief requested is made pursuant to Bankruptcy Rule 4001(c)(1)(B). First, the general proposed terms of the DIP Loan are as follows:

1. Interest Rate: A floating rate equal to Lender's Prime Rate (currently 3.25%) as published from time to time. See DIP Loan Agreement § 2.1.

2. Maturity: Ninety-one (91) days from the commencement of the budget contemplated by the DIP Loan Agreement, subject to an additional ninety-one (91) days upon the filing of a 363 Motion per the Re-Up DIP Loan. See DIP Loan Agreement §§ 1.3 and 1.4.

3. Events of Default: Include the following: (a) Debtors fail to pay timely any principal amount when due under this Agreement or any other amounts due under this Agreement on the date the same becomes due and payable; (b) either of the Cases is converted to a case under Chapter 7 of the Bankruptcy Code; (c) a trustee is appointed in either of the Cases; (d) the Bankruptcy Court enters an order: (i) granting relief from the automatic stay applicable under Bankruptcy Code Section 362 to the holder of any security interest or lien senior or pari passu to Lender's security interest in or lien upon any of Debtors' assets without the prior written consent of Lender in its sole and absolute discretion; or (ii) granting any lien or security interest that is senior or *pari passu* to any lien held by Lender in the collateral for the Loan without the

---

[1] All references to "Chapter" and "Section" herein are to title 11 of the U.S. Code (the "Bankruptcy Code"), and all references to a "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure. All references to "WDS Docket" are to the docket in Western Dairy's bankruptcy case, and all references to the "NRD Docket" are to the docket in NRD's bankruptcy case.

prior written consent of Lender in its sole and absolute discretion; (e) Debtors file any motion, plan of reorganization, or any action inconsistent with any order of the Bankruptcy Court; or (f) the failure of Debtors to perform or comply with any term, condition, covenant, representation, warranty, or obligation contained herein or any order of the Bankruptcy Court provided that Debtors shall have five (5) days to cure such failure after the date of written notice is sent by Lender to Debtors at the address set forth in the DIP Loan Agreement. Lender consents to the Debtors seeking a hearing before the Bankruptcy Court on order shortening time if the Debtors contest the right of Lender to declare an Event of Default. See DIP Loan Agreement, § 8.

4. <u>Liens</u>: The lien granted for the DIP Loan shall be a secured lien which is junior to existing encumbrances of the DB/JB Loan and the NSB Loan, and senior to any and all administrative claims pursuant to Section 503(b) of the Bankruptcy Code. See DIP Loan Agreement, Preliminary Statement G.

5. <u>Borrowing Limits</u>: Total amount to be loaned $472,580.00. See DIP Loan Agreement, Preliminary Statement E.

6. <u>Borrowing Conditions</u>: The proceeds of the DIP Loan must be used for normal operations and in the ordinary course of business, and not for any investigation of potential claims and causes of action against Lender. See DIP Loan Agreement, Preliminary Statement F, see also DIP Loan Agreement, §§ 3.3, 3.5.

7. <u>Interim Approval</u>: The approval of advances not to exceed $136,102.00 at the Interim Hearing.[2]

**B.  Specific Provisions.**

Second, whether the DIP Loan contains the following provisions listed in Bankruptcy Rule 4001(c)(1)(B)(i) through (xi) as follows:

1. "[A] grant of priority or a lien on property of the estate under § 364(c) or (d)."

The DIP Loan proposes to grant the DIP lender a secured, but junior lien pursuant to

---

[2] The first 13 week budget covers the period beginning May 30, 2010. Because certain emergency expenses (necessary to avoid immediate and irreparable injury to the property) will have been advanced by the time of the hearing on this Motion, such amount included amounts previously advanced.

1079676.5  3

Section 364(c) of the Bankruptcy Code, and with a priority over any and all administrative claims pursuant to Section 503(b) of the Bankruptcy Code. The proposed lien shall be junior to the pre-petition existing security interests held by DB/JB and NSB (as hereinafter defined) on the Debtors' properties. See DIP Loan Agreement, Preliminary Statement G.

2.   "[T]he providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim."

None.

3.   "[A] determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim." The validity, enforceability, priority and amount of the Initial Loan and Initial Indebtedness and lien securing the Initial Loan and Initial Indebtedness is acknowledged and agreed to by the Debtors. See DIP Loan Agreement, Preliminary Statement H.

4.   "[A] waiver or modification of Code provisions or applicable rules relating to the automatic stay."

Upon the occurrence of an Event of Default under the DIP Loan Agreement, Lender shall be entitled to submit an *ex parte* order to the Bankruptcy Court granting relief from the automatic stay to pursue the remedies as provided in the Initial Loan Documents, the DIP Loan Documents, and applicable state law; *provided, however*, any Event of Default may be waived in writing by Lender. Lender consents to the Debtors seeking a hearing before the Bankruptcy Court on order shortening time if the Debtors contest the right of Lender to declare an Event of Default terminate the advances hereunder and/or elect to pursue its remedies in the Event of Default. See DIP Loan Agreement § 8.2.

5.   "[A] waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364."

The DIP Loan provides that an Event of Default includes Debtors or any other party in

1079676.5   4

1  interest filing a proposed plan of reorganization inconsistent with the terms of the DIP Loan. <u>See</u>
2  DIP Loan Agreement § 8.1.(v).

3        6.    "[T]he establishment of deadlines for filing a plan of reorganization, for approval
4  of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order."

5      None, <u>*provided, however*</u>, the obligation of Lender to make any disbursements or
6  advances under the Re-Up Loan is subject to the Debtors filing a motion pursuant to Bankruptcy
7  Code Section 363(f) to sell substantially all of the assets of Debtors free and clear of liens prior
8  to the Maturity date of the Initial DIP Loan. <u>See</u> DIP Loan Agreement § 5.2.

9        7.    "[A] waiver or modification of the applicability of nonbankruptcy law relating to
10  the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of
11  the lien."

12      The Debtors waive any challenge to the validity, priority or perfection of the Initial Loan.
13  However, other parties in interest may seek to avoid or challenge the validity, perfection or
14  enforceability of the liens in favor of Lender. <u>See</u> DIP Loan Agreement, Preliminary Statement
15  H.

16        8.    "[A] release, waiver, or limitation on any claim or other cause of action belonging
17  to the estate or the trustee, including any modification of the statute of limitations or other
18  deadline to commence an action."

19      The Debtors waive any claim or cause of action as against Lender arising out of the
20  Initial Loan and/or Initial Loan Documents. <u>See</u> DIP Loan Agreement, Preliminary Statement
21  H.

22        9.    "[T]he indemnification of any entity."

23      Debtors agree to indemnify and hold harmless Lender for any matters arising out of or
24  related to the DIP Loan. <u>See</u> DIP Loan Agreement § 9.1.

25        10.    "[A] release, waiver, or limitation of any right under § 506(c)."

26      Debtors waive any right of surcharge absent Lender approval, which remains in Lender's
27  sole and absolute discretion. <u>See</u> DIP Loan Agreement § 7.3.

28        11.    "[T]he granting of a lien on any claim or cause of action arising under §§ 544,

545, 547, 548, 549, 553(b), 723(a), or 724(a)."

None.

## II.
## JURISDICTION AND VENUE

8. On February 3, 2010 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases").

9. Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

10. The Court has jurisdiction over these Chapter 11 Cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue of the Debtors' cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

11. On February 23, 2010, the Office of the U.S. Trustee filed a <u>Notice</u> regarding the appointment of an unsecured creditors' committee (the "Committee") in the Western Dairy bankruptcy case. <u>See</u> WDS Docket No. 20. As of the filing of this Motion, no counsel has filed any request to be employed as counsel to the Committee.

## III.
## STATEMENT OF FACTS

A. **The Debtors' Business and Ownership Structure.**

12. Western Dairy is based in Yerington, Nevada and is in the business of processing, manufacturing and distributing milk and various other dairy products throughout the western United States. Western Dairy has the capacity to process approximately 800,000 gallons of milk per week (the "Western Dairy Business").[3] <u>See</u> Berry Declaration, ¶ 3.

13. NRD is also based in Yerington, Nevada. NRD owns the real property and

---

[3] Western Dairy, with slight modifications to its processing line, would also have the capacity to bottle organic milk products, soy, juice, and punch for retail chains with its own in-house label. However, prior to the filing of its petition, Western Dairy did not engage in this activity.

1079676.5  6

building in Yerington, Nevada where the Western Dairy Business is conducted (the "NRD Business" and, together with the NRD Business, the "Business"). See Berry Declaration, ¶ 4.

14. The members of both Western Dairy and NRD are as follows: (a) Clear View Ranch, LLC, a Nevada limited liability company, c/o Roger Ligtenberg, Manager; (b) Norman D. Brown, Inc., a Nevada corporation, c/o Michael N. Compston, President ("Compston"); (c) The Matthew & Yvette Berry Family Trust, c/o Matthew B. Berry, Trustee ("Berry"); and (d) The Thomas R. Reviglio Family Trust, c/o Thomas R. Reviglio, Trustee (collectively, the "Members"). See Berry Declaration, ¶ 5.

15. Each member holds a 25% membership interest in both Western Dairy and NRD. Berry is the managing member of Western Dairy, and Compston is the managing member of NRD. As such, the Debtors are "affiliates" of each other pursuant to Section 101(2)(B) of the Bankruptcy Code. See Berry Declaration, ¶ 6.

16. NRD's principal asset is a warehouse facility located at 103 McCleod Street, Yerington, Nevada (the "Real Property"). NRD, as landlord, leases the Real Property to Western Dairy, as tenant, pursuant to a Lease Agreement dated as of May 1, 2008. See Berry Declaration, ¶ 4.

17. The Debtors believe that the fair market value of the Business will be significantly compromised and negatively impacted if the Debtors were not allowed to maintain the Business in its present condition, while it tries to liquidate. The Debtors also believe that a maintenance of the Business in its present state and the sale of the Business as an entirety will generate the highest and best price and is in the best interest of the creditors of the Estates. See Berry Declaration, ¶ 19.

B. **The Debtors' Pre-Petition Loans.**

1. **NRD's Loan with DB/JB.**

18. On or about August 6, 2008, NRD entered into a loan agreement with DB-JB Investments, LLC, a Nevada limited liability company ("DB-JB"), as lender, for the principal sum of $2,500,000.00 (the "DB-JB Loan"). Devere Barker and Jeffrey Barker are the managers

of DB-JB. The DB-JB Loan was secured by a deed of trust recorded against NRD's Property in favor of DB-JB. See Berry Declaration, ¶ 7.

19. Each of the individual owners or trustees of the Members of NRD personally guaranteed the DB-JB Loan. See Berry Declaration, ¶ 8.

20. On or about September 22, 2008, DB-JB and NRD entered into a First Supplement to Loan Agreement whereby DB-JB agreed to loan NRD an additional sum of $2,000,000.00. See Berry Declaration, ¶ 9.

21. On or about December 12, 2008, DB-JB and NRD entered into a Second Supplement to Loan Agreement whereby DB-JB agreed to loan NRD an additional sum of $500,000.00. See Berry Declaration, ¶ 10.

22. On or about December 12, 2008, each Member of NRD ratified and confirmed the personal guarantee previously provided to DB-JB. See Berry Declaration, ¶ 10.

23. On December 23, 2008, DB-JB recorded a Notice of Future Advance which was secured by the lien and priority of the Deed of Trust previously recorded. See Berry Declaration, ¶ 11.

2. **Western Dairy's Loan with Nevada Security Bank/Nevada State Bank.**

24. On March 12, 2007, Western Dairy entered into a Loan Agreement and Note with Nevada Security Bank, a Nevada banking corporation ("Nevada Security Bank"), for the original principal sum of $13,000,000.00 (as amended, the "NSB Loan"). See Berry Declaration, ¶ 12.

25. The NSB Loan was secured and properly perfected in all or substantially all of Western Dairy's personal property. See Berry Declaration, ¶ 13.

26. Each of Western Dairy's Members and the individual owners or trustees of the Members all personally guaranteed the NSB Loan. See Berry Declaration, ¶ 14.

27. On March 26, 2007, Nevada Security Bank, as lead bank, and Nevada State Bank, as participant (collectively, the "Banks"), entered into a Participation Agreement (the "Participation Agreement") with respect to the NSB Loan, whereby Nevada Security Bank agreed to sell to Nevada State Bank an undivided 50% interest in the NSB Loan, not to exceed at any one time $6,500,000.00. The Participation Agreement further provided that all Loan

Documents (as defined therein) would be in the name of Nevada Security Bank, without reference to Nevada State Bank, and that Nevada Security Bank was the sole owner of the NSB Loan, the Loan Documents, and all security interests, pledges, liens, mortgages and encumbrances securing that loan. The Participation Agreement provided that Nevada State Bank, in turn, was the holder of an equitable interest in the NSB Loan. The Participation Agreement also provided that Nevada Security Bank was to administer and service the NSB Loan. See Hanley Declaration, ¶ 3.

28. On December 12, 2007, Western Dairy and Nevada Security Bank entered into a Change in Terms Agreement, which, among other matters, extended the maturity of the NSB Loan to April 12, 2008, and increased the credit line $3,600,000.00 from $13,000,000.00 to $16,600,000.00. The Change in Terms Agreement also added additional collateral in the form of a security interest in the membership interests of NRD, which security interest was properly perfected. See Berry Declaration, ¶ 15.

29. In April and July 2008, Western Dairy and Nevada Security Bank entered into two additional Change in Terms Agreements, the second of which substantially changed the terms of the Note, including among other things, scheduling amortization over 15 years, with final maturity on October 12, 2023. See Berry Declaration, ¶ 16.

30. On August 27, 2008, the Banks entered into a Master Loan Participation Agreement Modification, which, among other matters, extended the term of the Participation Agreement. See Hanley Declaration, ¶ 4.

31. On April 13, 2010, the Banks entered into a First Amendment to Participation Agreement (the "Participation Amendment"), whereby they agreed, among other matters, to exchange roles with respect to the NSB Loan. Specifically, Nevada State Bank assumed the role of lead bank, and Nevada Security Bank assumed the role of participant. As such, Nevada State Bank is now in charge of servicing and administering the NSB Loan on behalf of both itself and Nevada Security Bank, and is the owner of the NSB Loan, the Loan Documents, and all security interests, pledges, liens, mortgages and encumbrances securing the Loan, subject to Nevada Security Bank's equitable interest in the NSB Loan. See Hanley Declaration, ¶ 5.

C. **The Bankruptcy Cases.**

32. On February 3, 2010, the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

33. Western Dairy's bankruptcy schedules list personal property with a value of $26,245,940.86, which includes various unliquidated potential litigation claims against various parties, including but not limited to a claim against its architects in the amount of $8,000,000. See WDS Docket No. 21, Schedule B. Western Dairy's bankruptcy schedules also list the NSB Loan as a secured claim in the amount of $16,906,691.43. See id. at Schedule D.

34. NRD's bankruptcy schedules list real property with a current value of $19,000,000, and personal property with a value of $8,035,448.31, including but not limited to an unliquidated potential litigation claims against its architects in the amount of $8,000,000. See NRD Docket No. 18, Schedules A and B. NRD's bankruptcy schedules also list the DB/JB Loan as a secured claim in the amount of $5,000,000, and the NSB Loan in the amount of $3,600,000.00. See id. at Schedule D.

35. On April 27, 2010, Nevada Security Bank filed proofs of claim in each of the Debtors' bankruptcy cases in the amount of $16,906,691.43. See WDS Docket, Claim No. 22; NRD Docket, Claim 3 (collectively, the "NSB Claims").

36. On May 5, 2010, Nevada State Bank filed statements per Bankruptcy Rule 3001(e)(2) regarding the transfer of the NSB Claims to Nevada State Bank, of which notice has also been given. See WDS Docket Nos. 37 and 39; NRD Docket Nos. 30 and 32.

37. On May 19, 2010, the law firm of Downey Brand filed its retention applications in the respective Debtors' cases, which are set for hearing on June 23, 2010. See WDS Docket No. 41, NRD Docket No. 34.

38. On May 25, 2010, the Debtors filed a motion requesting that the Court authorize the joint administration of their Chapter 11 Cases, which is set for hearing on June 23, 2010. See WDS Docket No. 46; NRD Docket No. 39.

**D.     The Need for the DIP Loan.**

39.     The Business is being presently maintained by the Debtors. Given the unique nature of the Business (the processing, manufacturing, bottling and distributing of dairy products), the Debtors have been maintaining the assets comprising the Business since the Petition Date in order to avoid the loss of the component parts of the Western Dairy Business. See Berry Declaration, ¶ 17.

40.     Debtors have determined that they must continue to explore efforts to sell the Business over the next several months. In order to do this, however, it is imperative that the Debtors preserve the Business in the meantime, but they lack sufficient funds from which to do so. Debtors have therefore prepared and developed a budget (the "Budget"), which provides for expenses for the continued preservation and maintenance of the business pending a sale, but also requires an influx of cash in addition to use of Cash Collateral. A copy of the Budget is attached hereto as Exhibit A to the Berry Declaration.

41.     Approving, pursuant to Section 364(c) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(c) and 9014, secured postpetition financing in an amount of $266,790.00 (the "Initial DIP Loan") and upon further proceedings and the entry of a final order, an aggregate principal amount not to exceed $472,580.00 (the "Re-UP DIP Loan" and collectively with the Initial DIP Loan, the "DIP Loan"), and for the Debtors to adopt and execute the Debtor in Possession Loan Agreement. A copy of the Debtor in Possession Loan Agreement is attached as Exhibit B to the Berry Declaration.

42.     The Debtors have not been successful in obtaining unsecured credit in the amounts required in the Budget as provided for in Section 364(a) and (b) of the Bankruptcy Code simply as an administrative expense pursuant to Section 503(b)(1) without a superpriority administrative expense as provided for in Section 364(c)(1) of the Bankruptcy Code. The Debtors have also concluded that there is no unencumbered real or personal property owned by the Debtors that would be available to secure a lien as provided for in Section 364(c)(2) of the Bankruptcy Code. As such, the Debtors have determined that the Estates have no property that could be used to provide adequate protection to NSB to protect NSB as required by Section

364(d) of the Bankruptcy Code without NSB's consent, which NSB is not willing to provide except pursuant to the terms of the Agreement. The Agreement is fair and reasonable under the circumstances, and necessary and appropriate for the maintenance and preservation of the collateral under the NSB Loan. See Berry Declaration, ¶ 20.

43. The Debtors and NSB have acted in good faith with respect to negotiation of this Agreement. The Debtors and NSB believe the Agreement provides NSB with the adequate protection required under Sections 361 and 363(e) and the protections of Section 364(e). The parties believe that the Agreement and the provisions thereof are in the best interest of Debtors' Estates and their creditors. See Berry Declaration, ¶ 21.

44. Debtors further recognize that cash on hand and in their bank accounts, which is minimal, as well as all cash generated from the Business in the future, is Cash Collateral, and as such, NSB is entitled, pursuant to Sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Collateral as a condition to Debtors' use of Cash Collateral. See Berry Declaration, ¶ 22.

45. Given the nature of the Business and the immediate need for the infusion of funds to pay employees and maintain the Business premises and equipment, the Debtors need the immediate advance of $136,102.00 pending the Final Hearing of this Motion.[4] See Berry Declaration, ¶ 23. This advance will allow them to pay the United States Trustee fees which are currently due and payable as well as those US Trustee fees which will be incurred as a result of the DIP Loan. Debtors further request that the Final Hearing be scheduled before July 23, 2010.

## IV.
## LEGAL AUTHORITY

**A.    Approving the DIP Loan, Including the Junior Secured Lien, is Appropriate.**

46. As debtor in possession, the Debtors are authorized to operate the Business and property in the ordinary course of business. As part of that operation, the Debtors may incur unsecured debt in the ordinary course of the Business. See 11 U.S.C. § 364(a). The Bankruptcy

---

[4] This amount includes funds already advanced by NSB on an emergency basis as indicated in the Budget, for which Debtors also request approval.

Code offers a debtor in possession additional flexibility to the extent it needs additional credit, but cannot attract such credit on unsecured terms. Section 364 of the Bankruptcy Code provides a progression of various protections to induce a postpetition lender to extend credit to a debtor in possession.

47. As a condition to extending the DIP Loan, NSB required the protections contained in Section 364(c) of the Bankruptcy Code. Section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c)(1).

48. Notably, the proposed DIP Loan is not proposed to be made on a superpriority basis pursuant to Section 364(d) of the Bankruptcy Code, and thus will not prime either the DB/JB Loan with NRD or the existing NSB Loan with the Debtors.

49. Given the financial situation of the Debtors, Debtors have not found and cannot obtain funding on a merely unsecured basis. Absent the protections in Section 364(c) of the Bankruptcy Code, NSB is unwilling to provide the DIP Loan, nor, as discussed above, were the Debtors able to identify any credible potential lending source that would be willing to make a loan sufficient to satisfy the Debtors' minimum needs without the protections available pursuant to Section 364(c) of the Bankruptcy Code.

50. The alternatives set forth in Section 364(c) of the Bankruptcy Code are not exclusive, and the debtor may offer more than one of the protections. See, e.g., In re Sobiech, 125 B.R. 110 (Bankr. S.D.N.Y.), aff'd, 131 B.R. 917 (S.D.N.Y. 1991). The extent of the priority

and lien for the DIP Loan will be limited to the credit extension approved by the Court. See William B. Schnach Retirement Trust v. Unified Capital Corp. (In re Bono Dev., Inc.), 8 F.3d 720 (10th Cir. 1993). Such borrowings under Section 364(c)(1) of the Bankruptcy Code will remain subordinate to the pre-petition consensual liens on the property. See KS Invs. v. T.M. Sweeney & Sons LTL Servs, Inc. (In re T.M. Sweeney & Sons LTL Servs., Inc.), 131 B.R. 984, 989 (Bankr. N.D. Ill. 1991).

B. **Adequate Protection.**

51.  Pursuant to Section 364(c) of the Bankruptcy Code, the Debtor must provide adequate protection to NSB. Though neither section 361 nor any other provision of the Bankruptcy Code defines the nature and extent of the "interest" of the secured creditor that is entitled to adequate protection, Section 361 of the Bankruptcy Code plainly provides that the qualifying interest demands protection only to the extent that the use of the creditors' collateral will result in a decrease in the "value of such entity's interest in such property." 11 U.S.C. § 361; *see also*, 11 U.S.C. § 363(e).

52.  The United States Supreme Court addressed the issue in United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assoc. Ltd. 484 U.S. 365 (1988) ("Timbers"). Timbers instructs that a secured creditor is entitled to "adequate protection" against diminution in its interest in its asserted collateral by reason of use of such collateral. Where the secured creditor's interest and the value of the collateral are not diminishing by its use, sale or lease, it follows that the secured creditor's interest is adequately protected. Id. at 369-73 ("interest in property" entitled to protection is "the value of the collateral" that secures such claim).

53.  Even if any other pre-petition creditor holds a valid and perfected security interest or lien entitled to the "adequate protection" analysis under Section 364 of the Bankruptcy Code, they would be benefited by the relief sought pursuant to this Motion, the proposed use of cash collateral and the advance of the funds under the DIP Loan, because as discussed below, the value created by maintaining the Debtors' going concern value benefits all creditor constituencies.

54.  The adequate protection provided to NSB here is clear and supported by the facts.

1079676.5 14

Without such adequate protection, NSB would not consent to the terms of the DIP Loan, the proposed use of the Cash Collateral and the proposed priming liens. Furthermore, if the Collateral is not properly maintained, it would be catastrophic to the value therein held by NSB and any other pre-petition secured creditors.

C. **NSB Has Consented to Use of Cash Collateral.**

55. In addition to other relief sought pursuant to this Motion, the Debtors seek authority pursuant to Section 363 of the Bankruptcy Code to use pre-petition collateral that is cash collateral in the ordinary course operation of the Debtors' Business. Section 363(c)(2) of the Bankruptcy Code prohibits a trustee or debtor in possession from using cash collateral without obtaining either (i) the consent of each entity that has an interest in such cash collateral, or (ii) a court order authorizing the use of cash collateral.

56. When cash collateral is to be used consensually, Bankruptcy Rule 4001(d) applies. See In re Manchester Ctr., 123 B.R. 378 (Bankr. C.D. Cal. 1991); American Savs. & Loan Ass'n v. Weber (In re Weber), 99 B.R. 1001, 1005 (Bankr. D. Utah 1989). As discussed above, NSB has consented to the use of the Cash Collateral, subject to its use in conformance with the Budget.

## V.
## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, as follows:

1. Approving and authorizing the DIP Loan, DIP Loan Agreement, and the Budget on which the DIP Loan is predicated, including specifically the grant of a valid, perfected and enforceable secured lien on all of the Debtors' property, which is junior to the existing encumberances of the DB-JB Loan and the NSB Loan, and senior to any and all administrative claims pursuant to Section 503(b) of the Bankruptcy Code, on an interim basis at an initial hearing and pending a final hearing, pursuant to Section 364(c) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(c) and 9014.

2. The entry of an Interim Order approving the DIP Loan and advances under the DIP Loan Agreement of up to $136,102.00 at the initial hearing.

3. The entry of a Final Order approving the DIP Loan and DIP Loan Agreement at a final hearing to be held no sooner than fourteen (14) days after the initial hearing and before July 23, 2010.

4. Allowing the Debtors to continue to collect and use the Cash Collateral in its Business in accordance with the Budget pursuant to Section 363(c)(2) of the Bankruptcy Code.

5. For such other and further relief as is just and proper.

DATED this 11 day of June, 2010.

DOWNEY BRAND LLP

By: /s/ Sallie B. Armstrong
SALLIE B. ARMSTRONG
MICHELLE N. KAZMAR
Attorneys for Debtors

1079676.5  16